## Case No. 13,257.

SPRIGG v. BANK OF MOUNT PLEASANT.

[1 McLean, 384.] [1]

Circuit Court, D. Ohio. Dec. Term, 1838. [2]

PRINCIPAL AND SURETY — SEALED INSTRUMENT—EQUITY—SUBROGATION.

1. Where an individual binds himself in a sealed instrument to pay a sum of money to a bank, as principal, he cannot, in equity, contradict the writing by showing that he was, in fact, surety.

[See Bank of Mount Pleasant v. Sprigg, Case No. 891; Sprigg v. Bank of Mount Pleasant, 10 Pet. (35 U. S.) 257.]

2. In such a case, the rule is the same in equity as at law.

3. A deed absolute upon its face, may be shown, by parol proof, to be in fact a mortgage; and this is admitted to prevent the fraud set up under the deed.

[See Bank of Mount Pleasant v. Sprigg, Case No. 891.]

4. In some cases a surety may compel the creditor to use active diligence against the principal.

5. And in all cases the surety, by paying the debt, is subrogated to the rights of the creditor.

6. But where all are principals, each stands liable for the debt, and no laches of the creditor can affect the liability of the obligors.

[This was a bill in equity by Samuel Sprigg against the Bank of Mount Pleasant.]

Mr. Hammond, for plaintiff.

Mr. Alexander, for defendant.

LEAVITT, District Judge. The case made in the bill is substantially as follows:

That in February, 1826, Peter Yarnall & Co. obtained a loan of $2,100 from the Bank of Mount Pleasant, and gave a single bill therefor, under seal, with the complainant, Richard Simms, Alexander Mitchell, and Z. Jacob, as

---

[4] [From 8 N. Y. Leg. Obs. 241.]

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in 14 Pet. (39 U. S.) 201.]

sureties in fact, though they acknowledged themselves in the obligation as principal debtors. The loan was for sixty days, by the terms of the bond; and the bill alleged that it was for the sole benefit of Yarnall & Co., and that the other obligors were only sureties; and that this was known to the bank; that when the bill became due, on the 21st of April, 1826, Yarnall & Co. paid, and the bank received the discount for the further period of sixty days: that from that time, at the expiration of each successive 60 days, the loan was continued, and the discounts so paid and received as aforesaid, till September or October, 1828; at which time Yarnall & Co. failed, and continued to be insolvent: that these extensions and continuances were granted by the bank to Yarnall & Co. without the knowledge or consent of the other obligors, or any, or either of them; and that they did not know of the non-payment of the bill till the time Yarnall & Co. failed: that from 1826 till 1828 Yarnall & Co. were in business, and perfectly solvent: and that if the other obligors had known of their failure to pay, they could have secured themselves. Complainant avers that these doings on the part of the bank were fraudulent as to him and his co-sureties, if the bank intended still to hold them liable: or, if such extensions were matter of contract with said Yarnall & Co. for the purpose of charging complainant with payment of said bill, he alleges that he is discharged from liability; and entitled to relief in equity, as it has been adjudged, that the foregoing facts are not available to him as a defence at law. The answer denies that Yarnall & Co. were received and treated by the bank as exclusively the principal debtors: and alleges that all the obligors were so considered; and that it was upon the faith of their contracting as principal debtors, that the bill was discounted: and, that if they had not so bound themselves, the loan would not have been made: and, that the obligors signed the bill with a full knowledge of its terms and the obligation it imposed: and having so contracted, are estopped from asserting that they signed as sureties merely. The answer denies that the extensions of the loan were without the knowledge of the complainant and the other obligors: denies also, that the bank knew anything of the insolvency of Yarnall & Co. till about the time suit was brought against complainant: denies any intention on the part of the bank to injure complainant by the extension of the loan; and avers, that the indulgence was granted on account of the confidence reposed in the obligors, and because they were all deemed to be principal debtors. The answer is not verified by oath. To the answer there is a general replication.

In the action at law, instituted by the bank against the complainant, on the bond in question, the pleas set up were substantially the facts contained in the bill as a defence. This court decided, that these facts were not a defence to the action; and the case being re-moved to the supreme court by writ of error, the judgment of this court was affirmed. It was there decided, that the complainant, having assumed in the obligation the character of a principal debtor, was precluded from showing that he was in fact only a surety. [10 Pet. (35 U. S.) 257.]

The complainant now insists, that though the defence set up, was not available to him, in the action at law, he is entitled to relief in equity. He claims, that the doctrine of estoppel is not recognized in courts of equity; and, that notwithstanding he admits himself to be a principal debtor, in the obligation, he is at liberty to show, that he was in fact only a surety; and as such, entitled to all the rights incident to that relation. It is claimed on the other hand, that complainant is estopped, as well in equity as at law, from denying the character which he assumes in the obligation: and that, upon the equity of the case, he is not entitled to relief.

In relation to the material facts involved in this case, there seems to be no ground for doubt or controversy. It is satisfactorily made out by the proofs and evidence, that the loan was obtained upon the application of P. Yarnall & Co. in the month of February, 1826: that at their instance, and upon the payment of the discounts by them, in advance, the loan was extended from time to time, till the fall of the year 1828: that the proceeds of the loan were passed to their credit in bank, and drawn for by their agent: and, the cashier thinks it was the understanding of the directors, that the money was for the use of Yarnall & Co., though he believes, that all the obligors were considered principal debtors. It also appears to have been the usage of the cashier, to open the account with and charge the proceeds of every loan to the first signer of the bond. It is also proved, that Yarnall & Co. failed in September or October, 1828, and that they have continued to be insolvent. It is not proved, that the complainant, or any of the obligors, who claim to have been sureties, had any knowledge of the extensions of the loan, or that it was with their consent.

No principle of law is better established, at this day, than that a creditor, by extending the time of payment, by agreement with a debtor without the consent of the surety, so as to suspend, even for a short time, his right to proceed against the former, discharges the surety from his liability. In the report of the case between these parties at law, 10 Pet. [35 U. S.] 257, the court say, "It falls within the settled rule of law in relation to sureties, that extending to the principal further time of payment, by a new agreement, will discharge the surety," and, although the court held in that case, that in the ordinary case of parties being bound jointly and severally in which all are prima facie principals, the remedy of the surety is in chancery, and not at law, yet a different doctrine prevails in Ohio. The case of the Bank of Steubenville v. Hoge, 6 Ham. (Ohio) 17, was an action of debt on a joint and

several obligation under seal. Oyer of the obligation was craved: and the defendants set up the fact of their being sureties and that the plaintiff had given time to the principal debtor, whereby they were discharged: and it was held that this defence might be made at law, as well as in equity. If the principle adverted to, was the only one presented in this case, the court would have no difficulty in coming to a decision. We could not hesitate to say, as the court said in the case just referred to in 10 Pet. [35 U. S.] if the defendant (complainant here) can be let in to set up, that he was surety only, the matter alleged is sufficient to exonerate him from liability in the present suit: we have no doubt, but the extension of the payment from time to time, was in effect, a suspension of the right of the bank to proceed on the bond; and therefore brings the case within the principle above referred to: if under the circumstances of this case, the complainant can be regarded as standing in a relation to the parties, different from what he has placed himself in the bond.

It becomes, therefore, a very material enquiry in this case, whether the complainant can avail himself of the matters attempted to be set up as a defence at law, as a ground of relief in equity. In the case between these parties at law, already referred to, the court say, in relation to the doctrine of estoppels: "It would seem in some measure to partake of severity, if not of injustice." But it is in reality founded upon the soundest principles, as a rule of evidence. That a party has, by his own voluntary act placed himself in a situation as to some matter of fact, that he is precluded from denying it: and in its application to the dealings and contracts of men in the affairs of human life, it is a salutary practical rule, that a man shall not be permitted to deny what he has once solemnly acknowledged. But it is claimed by the counsel for complainant, that this principle has no existence as applicable to cases in equity: that the doctrine of estoppel is not known there. It is said that the intimation of the court in the case referred to, sanctions the idea that the complainant is not estopped in equity, from showing the real character in which he signed the obligation in contradiction of the instrument. It may be remarked, in reference to this, that the question whether the defendant in that case was relievable in chancery, was not before the court for adjudication. Nor is it supposed that the court intended to give an opinion on that question, which should be regarded as authoritative. The remark of the judge is, that "a court of equity might allow him (the defendant,) to set up that he was only surety, and let him in to all the protections usually extended to sureties." It appears, however, from what precedes and follows this remark, that it was intended to apply to the case of a joint and several bond in the common form, and not to the case of a party expressly signing as a principal. In

support of the doctrine that estoppels are not known in equity, a reference is made to Theobold's Treatise on Principal and Surety, p. 69 (117), where it is said: "If several persons are obliged under seal, and appear by the terms of their engagement to be principals, they are estopped from proving themselves essentially sureties; and, therefore, such as are essentially only sureties, cannot at law use in defence, matter which might entitle them to a relief, either partial or entire; but in equity where there is no estoppel, they are permitted to prove themselves sureties." It is obvious that this has reference to the case of a joint and several obligation, in the usual form, where all the obligors are, by legal intendment, principals, and does not apply to the case of a party expressly designating himself as a principal. And, although it is contended there is no legal difference between these cases, we think they are plainly distinguishable. In the case at law between these parties, the court remarking upon the principle contended for by complainant's counsel, say, that parties to a joint and several bond in the usual form, are principals only "as prima facie presumption of law;" and again, "in ordinary cases, when sureties sign an instrument without any designation of the character in which they become bound, it may be reasonable to conclude, that they understood that their liability was conditional, and attached only in default of payment by the principal. But when one who is in reality only surety is willing to place himself in the situation of a principal by expressly declaring upon his contract that he binds himself as such, there cannot be any hardship in holding him to the character in which he assumes to place himself." It is clear from this, that the court recognized the distinction adverted to. And it is equally clear, that the remark just quoted applies with the same force and truth to cases in equity and at law.

The assertion that there is no estoppel in equity must certainly be understood with some modification. In 2 Story, Eq. Jur. p. 746, the true principle is stated. It is there said that "the same general rule prevails in equity, as at law, that parol evidence is not admissible to contradict, qualify, extend, or vary written instruments; and that the interpretation of them must depend on their own terms." But, in cases of accident, mistake or fraud, courts of equity are constantly in the habit of admitting parol evidence, to qualify and correct, and even to defeat the terms of written instruments. And again, in the case of Douglass v. Scott, 5 Ham. (Ohio) 194, "the court say if an admission is so made, that it cannot be denied without a breach of good faith, the law enforces the rule of good words, as a rule of policy, and precludes the party from repudiating his representations, and denying the truth of his admissions." In none of the cases to which the court have referred is it laid down, that the doctrine of estoppel

is unknown in equity; on the contrary, it is expressly recognized. In 2 Johns. Ch. 222, the court say, "that a party is not estopped by the recital in a deed, which was not true in point of fact; but introduced through mistake or misapprehension;" so, in 5 Johns. Ch. 23, it is laid down, "that a general recital in a deed will not conclude a party, though the recital of a particular fact may estop him," the court do not say, there is no estoppel in equity, but distinguish cases in which it does or does not apply.

It may then be safely asserted, that courts of equity will disregard the principle of estoppel, only in those cases where it becomes necessary to prevent injustice, through accident, mistake, or fraud. The common exercise of chancery jurisdiction, in declaring a deed absolute on its face, as a mortgage only, has been referred to as analogous to that which is claimed by the complainant in this case. It will be found however, in all the cases referred to, that courts exercise this power only where it is necessary to prevent the perpetration of a fraud. In the case cited by complainant, 1 Wash. (Va.) 126, the court say, in deciding whether a deed should be considered as a mortgage, or an absolute purchase, they would look to the intention of the parties, and "would not suffer it to be changed by any form of words which might elude the justice of the court, in permitting a redemption," and in the case in 4 Johns. Ch. 167, it is laid down that "parol evidence is admissible to show, that a mortgage only was intended, and not an absolute deed, and that defendant had fraudulently attempted to convert the loan into a sale." And upon the same principle, courts of equity will interfere in many cases to prevent the bar of the statutes (of limitation) where it would be inequitable or unjust. Thus, for example if a party has perpetrated a fraud which has not been discovered until the statutable bar might apply at law, courts of equity will interfere and remove the bar out of the way of the injured party. 2 Story, Eq. Jur. p. 738.

We come now to the important enquiry, namely, whether the bank, in the transaction involved in this case, has been guilty of any fraud, either actual or constructive, as towards the complainant. If the affirmative of this proposition can be successfully maintained, the complainant is entitled to the relief which he seeks for: and the court will be bound to disregard the doctrine of estoppel, for the accomplishment of the great purposes of justice. If the imputation of fraud rests upon the bank, in this transaction, it is to be deduced from the fact, that although the complainant signed the bond expressly as a principal debtor, yet the bank knew he was really a surety, and with that knowledge, extended the time of payment without the consent of complainant. There is no allegation or pretence that the com-

plainant acted under any misapprehension, as to the terms of the obligation, in becoming a party to it, or that the bank used any unfair means, in obtaining his name to it. He voluntarily placed himself in the situation of a principal, by declaring on the face of the bond, that he so contracted with the bank. It was in effect, a waiver of all the rights and protection, which, in becoming a party to a joint and several bond as a surety, in the usual form, he would be legally entitled to. The court can perceive no reason why a party may not thus voluntarily waive his rights. There is no principle of public policy violated in his doing so. The law recognizes certain rights as appertaining to one who becomes obligated as a surety. By a statute of Ohio, if sued with the principal, he may come into court and on adducing proof of the character in which he became a party to the obligation, may have the fact noted in the judgment; and thereby his property is protected from execution, till that of the principal is exhausted. And again—the law takes care that his rights shall not be jeoparded by any change in the original contract, without his consent. But if an individual, by his express contract agrees to forego these rights, may not the creditor treat him as occupying the relation in which he places himself? Instances of the waiver of legal rights, by individuals upon their own agreement, are of frequent occurrence. Take the familiar example of a debtor giving a cognovit. He thereby waives the right of being served with process: of making a defence to the action, of availing himself of any legal advantage at law; and, finally, by his express agreement to release all errors in the proceedings and judgment, he yields up the important legal right of prosecuting a writ of error to reverse the judgment. And as a further illustration of this principle, suppose the bank in this case (in accordance with an usage now common among the banks of Ohio,) had required of the parties to this bond, in addition to an acknowledgment, that they contracted as principal debtors, to sign a cognovit, authorizing the entry of a judgment against all, without distinction; could any of them set up their suretyship, and ask for the benefits and protection incident to sureties? Yet, in this, there would be no stronger or more valid admission of their being principal debtors, than if they had declared expressly in their bond alone that they obligated themselves, in that character. If the position urged by the complainant, in the case before the court, be tenable, then in the case here supposed, notwithstanding the double affirmation of their being principal debtors, they would be at liberty to controvert the fact, and claim the character of sureties. And even if a judgment had been entered in pursuance of the power to confess, it might be claimed that a court of

equity should interpose and vacate it, upon the ground, that though the parties by these solemn admissions, had made themselves principals, yet they were in fact sureties, and that was known to the bank. If fraud is imputable in such a transaction, it would certainly attach to the judgment, as well as to the bond and cognovit, and all the reasons urged for relief against the consequences of admission made in these instruments, might be urged with equal force in relation to the judgment. Yet it would not be seriously insisted, that this would present a proper case for the exercise of chancery jurisdiction, unless an actual palpable fraud was committed.

The court cannot keep out of view the real character of this transaction, as understood by the parties at the time. So far as the bank is concerned, it is evident, that the engagements of the obligors as principal debtors, was regarded as obligatory, and as giving the bank, the right to treat them, as such, to all intents and purposes. If it had not been so considered, it is obvious that the bank would not have extended the loan, from time to time, without the consent of all the parties to the bond. It was upon the faith of their contract as principal debtors, and the waiver of their rights as sureties, that the bank extended the indulgence. And may it not also be assumed, that the obligors viewed this bond, as differing in its character from a bond in the usual form? Could they fail to perceive, that something more was intended, than if the bond had been in the common form? Were they not notified by the very language of the instrument, that the bank considered and would treat them, as principal debtors? and if they did not intend so to be bound, why did they not object to the form of the bond: or, having executed it, with the understanding that they were assuming the characters of sureties, was it not due, in good faith to the bank that they should have given some intimation, that such was their understanding? It is laid down, by a celebrated writer on ethics, that the rule for the interpretation of a promise, is to consider it in the sense in which the promissor supposed the promissee understood it at the time. Though this is not the rule of law, in the construction of contracts, it may not be viewed, as wholly inapplicable, in an enquiry in which it is sought to ascertain the relative equities of parties. We think, that if the parties to the obligation, who claim that they are to be regarded merely as sureties, were apprized, that the bank recognized and considered them as principals, and as such gave them credit, by making the loan, and extending the time of payment, there can be no hardship, in forum conscientiæ, in holding them to that character. The bond in this case was in accordance with the form prescribed and used by the bank at that time. This form was, no doubt, adopted with the knowledge,

that however desirable it might be to the bank, that borrowers should meet their engagements promptly, they would not always be punctual; and that extensions would be unavoidable. To obviate the necessity of taking new obligations, as often as debts arrived at maturity, and to prevent any legal advantages arising to sureties from these extensions, all the parties were required to assume the character of principal debtors. The bank had an unquestionable right to prescribe this, as the condition on which money would be loaned. And in reference to the complainant, it is inferrible, that he was apprized of the usage of the bank, in this respect, as it is proved by the cashier, that during the continuance of the loan to Yarnall & Co. he was a party to several other bonds discounted by the bank, similar in form, to the one in question.

In any aspect in which the court have been able to view this case, and the principles applicable to it, they cannot grant the relief prayed for. The injunction is therefore dissolved, and the bill dismissed, at the costs of the complainant.

This decree, on an appeal to the supreme court, was affirmed. 14 Pet. [39 U. S.] 201.

SPRIGG (BANK OF MOUNT PLEASANT v.). See Case No. 891.